## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HERNAN VALDEZ,<br><br>               Plaintiff,<br><br>vs.<br><br>TYCO INTEGRATED SECURITY LLC, dba ADT SECURITY SYSTEMS, a Utah registered corporation, et al.,<br><br>               Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [26] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2-16-cv-00016-DN<br><br>District Judge David Nuffer |

Plaintiff Hernan Valdez ("Valdez") filed this lawsuit on January 6, 2016, alleging: (1) discrimination on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") against Defendant Tyco Integrated Security LLC ("Tyco"); (2) discrimination in violation of the Age Discrimination and Employment Act against Tyco; (3) discrimination on the basis of race and color in violation of Title VII against Defendant Jan Giddings ("Giddings"); (4) hostile work environment harassment in violation of Title VII against Tyco; (5) pay inequality in violation of Title VII against Tyco; and (6) discrimination on the basis of race in violation of 42 U.S.C. § 1981.[1]

---

[1] *See* Complaint, docket no. 2, filed January 6, 2016.

Valdez's age and equal pay claims and his claims against individual Defendant Giddings at the pleading stage.[2] Tyco moved for summary judgment against Valdez's remaining race and color claims.[3] After careful review of the memoranda and evidentiary materials submitted by the parties, the determination was made that Tyco's motion should be GRANTED without oral argument.[4] Tyco was instructed to prepare a draft a proposed memorandum decision and order and serve a copy on Valdez.[5] Valdez did not object to the proposed order.

## Contents

UNDISPUTED MATERIAL FACTS ........................................................................................... 3
SUMMARY JUDGMENT STANDARD ................................................................................... 11
DISCUSSION ......................................................................................................................... 12
    A.    Valdez Fails to Raise a Triable Issue of Race or Color Discrimination Under
        Section 1981 .............................................................................................................. 12
        1.    Valdez Fails to Establish a Prima Facie Case as to Most of the Acts He
                Contends Are Discriminatory. ................................................................. 12
        2.    Valdez Fails to Raise a Triable Issue of Pretext as to His Termination. .. 14
        3.    Valdez's Failure to Accommodate Claim Fails as a Matter of Law......... 19
    B.    Valdez Does Not Establish a Claim for Hostile Work Environment Under Section
        1981 ........................................................................................................................... 21
        1.    A Four-Year Statute of Limitations Bars Consideration of Conduct About
                Which Valdez Complains. ......................................................................... 25
        2.    Valdez Fails to Allege Conduct Sufficiently Pervasive or Severe. .......... 26
        3.    Valdez's Failure to Complain Entitles Tyco to a *Faragher/Ellerth*
                Defense. ................................................................................................... 28
    C.    Valdez's Title VII Claims Fails for All the Same Reasons His Section 1981
        Claims Fail, and for Additional Independent Grounds. ........................................... 32
        1.    The Vast Majority of Conduct About Which Valdez Complains Is Time-
                Barred Under Title VII............................................................................. 32
        2.    Valdez Failed to Administratively Exhaust His Only Timely Claims Under
                Title VII. .................................................................................................. 34

---

[2] *See* Memorandum Decision and Order Granting Defendant's Motion to Dismiss Second, Third, and Fifth Claims for Relief, docket no. 15, filed April 20, 2016.

[3] Defendant Tyco Integrated Security LLC's Motion for Summary Judgment, docket no. 26, filed February 24, 2017.

[4] *See* Notice from the Court re [26] Defendant Tyco Integrated Security LLC's Motion for Summary Judgment, docket no. 35, filed July 17, 2017.

[5] *Id.*

D.    Tyco Is Entitled to Summary Judgment on Grounds that Valdez Cannot Recover
      Damages............................................................................................................ 34
      1.    Valdez's Inability to Work Forecloses a Claim for Economic Damages.  35
      2.    The WCA and a Separate Civil Lawsuit Foreclose Valdez's Claims for
            Both Economic and Non-Economic Damages. ....................................... 36
ORDER ..................................................................................................................... 38

## UNDISPUTED MATERIAL FACTS[6]

1.    Tyco designs, installs, and maintains integrated security and surveillance systems to detect intrusion, fire, environmental conditions, industrial processes and other hazards.[7]

2.    Tyco employed Valdez as an Installer of commercial security systems in Salt Lake City, Utah, most recently from August 2005 until April 2013. Valdez's primary duties involved the servicing and installation of fire alarm systems. Valdez's position frequently required him to drive a van between worksites, work at heights, and work with electricity.[8]

3.    Valdez alleges that four Tyco employees took discriminatory action against him during his employment with Tyco:  Giddings, Scott Hill ("Hill"), Rob Stokes ("Stokes"), and Dennis Williams ("Williams").[9]  Of those four persons, only Giddings was authorized to hire, fire, demote, formally evaluate, or issue written discipline to Valdez.[10]

---

[6] In violation of DUCivR 56-1(c)(2)(B), Valdez did not indicate whether he conceded or disputed Tyco's statement of material facts, but instead spent four pages of his Opposition brief proffering his own version of "background" facts. Those alleged facts are either unsupported by evidence or based on Valdez's declaration, which is largely inadmissible for the reasons stated in Tyco's Evidentiary Objections. Defendant Tyco's Reply in Support of Motion for Summary Judgment, Appendix A, Docket. 31-1, filed April 7, 2017. The instances where Valdez has failed to support his factual assertions with any citation to the record "with particularity" are therefore ignored. *See* DUCivR 56-1(c)(2)(C); Fed. R. Civ. P. 56(c)(1); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.") (internal punctuation and citations omitted).

[7] Declaration of Janice Giddings in Support of Defendant's Motion for Summary Judgment ¶ 2, docket no. 28, filed February 24, 2017.

[8] Declaration of James M. Barrett in Support of Defendant's Motion for Summary Judgment, Ex. 1 (hereinafter "Depo. I") 19:5-25; 20:18-20:4; 25:1-4; 26:14-20; Docket no. 28, Ex. 4.

[9] Depo. I 89:6-90:6, 95:25-96:6; Declaration of James M. Barrett in Support of Defendant's Motion for Summary Judgment, Ex. 2 (hereinafter "Depo. II") 40:14-18, docket no. 27-2, filed February 24, 2017.

[10] Docket no. 28, ¶¶ 3, 15; Depo. I 89:6-90:6, 95:25-96:6.

### Valdez's Allegations Regarding Giddings

4.    Valdez identified the following allegedly discriminatory acts taken by Giddings: (a) Valdez walked in on a conversation between Giddings and another employee and believes Giddings was saying to the employee (or was about to say) "I hate Mexican music," but all Valdez overheard was "I hate Mexican"; (b) Valdez sometimes had difficulty obtaining tools he needed for his job; and (c) after Valdez left Tyco's employment, Giddings did not allow him on company premises to retrieve his tools from his work van.[11]

5.    Valdez never heard Giddings say anything negative to him about Mexicans or Hispanics.[12] He never heard Giddings say anything he perceived to be negative about Mexicans or Hispanics, except for the comment he overheard about her dislike of Mexican music, noted above, which she made to another employee.[13] He does not remember whether he heard Giddings say anything he found offensive in 2012, the last year Valdez reported to work.[14] Giddings always approved Valdez's requests for tools eventually, and while it may have taken a follow-up request, Valdez ultimately received the tools he needed to perform his job, except for a "couple times."[15]

### Valdez's Allegations Regarding Hill

6.    Valdez alleges that Hill made general negative comments about Mexicans and would not work with him on certain jobs.[16] However, Valdez worked with Hill only "about three times in [his] whole career" and would only see him in passing when jobs were assigned.[17] Valdez occasionally overheard Hill make remarks in the parking lot about throwing rocks at

---

[11] Depo. I 98:21-100:22; Depo. II 59:15-61:1.

[12] Depo. I 99:8-100:6.

[13] Depo. II 60:21-61:1.

[14] Depo. II 60:12-14; 67:1-9-14.

[15] Depo. I 108:1-20.

[16] Depo. I 95:8-96:7.

[17]  Depo. II 53:25-54:12.

Mexicans coming over the border and taking "Mexican showers."[18]  However, Hill never directed negative comments to Valdez.[19]  Valdez does not remember whether Hill said anything he found offensive in 2012, the last year Valdez reported to work.[20]

7.      In November 2011, Valdez believes Hill "got [Valdez] in trouble" by reporting that Valdez had left material unsecured at a worksite.[21]

### Valdez's Allegations Regarding Stokes

**8.**      Valdez alleges that Stokes made "burro jokes," "Juan Valdez coffee" jokes, and "Mexican shower" jokes.[22]  However, Valdez worked with Stokes only "about four times."[23]

### Valdez's Allegations Regarding Williams

9.      Valdez worked with Lead Installer Dennis Williams frequently.[24]  According to Valdez, Williams did not make Mexican jokes every time he and Valdez worked together, but, in the break room, where Williams "had a crowd for everybody to laugh and 'whooo,' and all this stuff," then Williams made Mexican jokes.[25]  At his deposition, Valdez could recall only four jokes by Williams: (a) in reference to Valdez, Williams would joke "Watch out for him because he'll steal your stuff"; (b) in a conversation with Hill, Valdez overheard Williams refer to Mexicans crossing the border as "wetbacks"; (c) Williams made "burrito jokes" when everybody was eating burritos; and (d) Williams said "here comes Juan Valdez and his burro" every time Valdez had his cart, which Valdez admitted he thought was funny, at least at first.[26]  Valdez did

---

[18] Depo. I 97:5-23.

[19] Depo. I 97:5-23.

[20] Depo. II 60:12-14; 67:1-9-14.

[21] Depo. II 55:20-56:23.

[22] Depo. II 40:19-41:19.

[23] Depo. II 40:19-41:19.

[24] Depo. I 92:1-8; Docket no. 28, ¶ 15.

[25] Depo. II 49:18-50:3.

[26] Depo. II 43:13-44:2, 52:1-25, 53:7-13; 44:11-14.

not think Williams told jokes to make Valdez feel bad; Valdez believed Williams told the jokes to be funny.[27]

10.     In 2011, Williams had Valdez "dig a trench to bury a pipe."[28]

### Valdez's Failure to Complain

11.     Tyco's Handbook contains robust anti-discrimination, anti-harassment, and anti-retaliation policies, and procedures for reporting harassment.[29] Valdez received a copy of the Handbook.[30] He was also aware of Tyco's channels for reporting harassment.[31]

12.     Valdez testified at two separate depositions that he did not complain of harassing conduct to any management-level employee of Tyco or utilize any of Tyco's other reporting channels.[32] He further testified that he did not complain because he thought he could "hold [his] own and be able to stomp [the harassment] out himself," because he did not "trust authority,"

---

[27] Depo. II 50:17-19.

[28] Depo. I 93:17-24.

[29] Docket no. 28-1 at 12, 20.

[30] Depo. I 85:15-19.

[31] Depo. I 83:11-84:2; 84:8-87:1; 87:25-88:17.

[32] Depo. I 83:11-84:2; 84:8-87:1; 87:25-88:17; Depo. II 18:22-19:4; *see also* Docket no. 28, Ex. 1, at 12, 20. 1. Despite this testimony, Valdez submitted a declaration in opposition to Tyco's motion stating, for the first time, that he "complained [of harassment] to local management, … and Corporate Management." Declaration of Hernan Valdez in Opposition to Motion for Summary Judgment ¶ 35, docket no. 30-1, filed March 24, 2017. Tyco objected and moved to strike this statement, along with other portions of Valdez's declaration and other evidence submitted by Valdez in opposition to summary judgment because, *inter alia*, Valdez fails to offer any competent explanation for contradicting his prior sworn testimony. *See* Defendant's Reply in Support of Motion for Summary Judgment, Appendix A docket no. 34-1, filed April 7, 2017 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Cline v. Chase Manhattan Bank USA*, No. 2:07-CV-00728 BSJ, 2009 U.S. Dist. LEXIS 7104, **9-10 (D. Utah Jan. 30, 2009)). Tyco's evidentiary objections well-taken and accordingly strikes the following from the record: Paragraphs 1, 7-24, 31, 32, 34-50, 55, 56, 64, 70-75, 79, 84-88, and 92 of the Valdez Declaration in their entirety; the statement, "Jan [made] jokes about Mexicans and wetbacks," in Paragraph 53 of the Valdez Declaration; the statement, "I think Jan and others did it intentionally to make fun of me and hurt me," in Paragraph 91 of the Valdez Declaration; the first sentences of Paragraphs 93 and 95 of the Valdez Declaration; Paragraph 9 of the Muirhead Declaration in its entirety; the third sentences of Paragraphs 10 and 11 of the Muirhead Declaration; Paragraph 2 of the Ball Declaration in its entirety; the first two sentences of Paragraph 1 of the Ball Declaration; and the first sentence of Paragraph 3 of the Ball Declaration.

because "[y]ou can't complain every time someone says something," and because he thought he "would have been inundated with more paper."[33]

## Valdez's Workplace Injury

13.     In March 2011, Valdez suffered an injury while installing surveillance cameras at a slaughterhouse. While kneeling to position a camera, his protective hard hat fell off, and the top of his head touched a live electrical wire. The incident was reported and accepted as a compensable work-related injury under Utah's Workers' Compensation Act.[34] Valdez attributes all his physical and mental health conditions to this injury.[35]

14.     Valdez received wage replacement benefits from Tyco's workers' compensation insurer as a result of the injury at the slaughterhouse.[36] He also received a settlement from workers' compensation for his medical treatment.[37]

15.     After the workplace injury, Valdez took an approved leave under the Family and Medical Leave Act ("FMLA"), from May to June 2011, when he was cleared to return to work. However, after his return, Valdez continued to experience physical and mental problems that he attributed to the electrical shock injury. For example, Valdez testified that "things were going wrong," that he was experiencing dizziness, and that he had issues with his peripheral vision that caused him difficulty in driving his van.[38]

## Valdez's Disability Leave

16.     In July 2012, Valdez had a panic attack while working at heights on a ladder at a jobsite. The foreman excused Valdez from the worksite, and Valdez told Giddings about his

---

[33] Depo. I 83:11-84:2; 84:8-87:1; 87:25-88:17; Depo. II 42:8-17.

[34] Depo. I 31:18-23; 33:1-10, Docket no. 28-5.

[35]  Depo. I 36:11-16, 37:3-39:24, 40:8-41:8, 44:19-25, 57:14-59:3; Docket no. 28-8.

[36] Depo. I 31:18-23, 32:8-33:10.

[37] Depo. I 31:18-23, 32:8-33:10; Depo. II 25:6-26:9; 30:3-7.

[38] Depo. I 48:13-49:9; 50:11-23; 53:6-54:9; Docket no. 28-6.

continuing difficulties. Giddings arranged to have Valdez driven home by a coworker and recommended that he take a short-term disability ("STD") leave.[39]

17.     The last day Valdez reported to work was July 26, 2012. At that time, he was placed on an STD leave from which he never returned. Once he was no longer in the workplace, Valdez did not communicate with the coworkers that he alleged had harassed him or experience any allegedly harassing conduct.[40]

18.     A few days after Valdez was placed on STD leave, he saw a physician and reported a litany of physical and mental impairments, all of which he attributed to his electrical shock injury in March 2011. Those impairments included severe headaches multiple times a week, unstable mood, extreme stress and anxiety, difficulty concentrating, panic attacks, restlessness, nightmares, flashbacks, hypervigilance, severe depression, difficulty in performing household chores and caring for his daughter, sporadic appetite, lethargy, restless during sleep, significant feelings of worthlessness and guilt, anhedonia, occasional suicidal ideation, difficulty maintaining a work schedule, and moodiness.[41]

19.     Valdez was subsequently referred to a neurologist, whose assessment of Valdez was that he was "dealing with such intense anxiety that he is unable to perform the duties of his job and cannot function." Valdez's primary care physician agreed, stating that his condition was "chronic," that it was likely that he would be incapacitated "for at least one year," that his symptoms severely impaired his ability to complete job duties, and that he was unable to perform any duties at that time.[42]

20.     Valdez agreed with his doctors' assessments. Moreover, he testified that, with the exception of the fact that he has not "seen flashes" for a while, all the symptoms he reported to

---

[39] Depo. I 54:10-55-21; [Docket no. 28](#) ¶ 10; [Docket no. 28-7](#).

[40] Depo. I 95:4-7; 98:16-18; 98:21-100:18.

[41] Depo. I 55:12-56:15; 56:23-59:3.

[42] Depo. I 60:8-61:8; 62:16-24.

his physician in July 2012 have "stayed the same," and he suffers from all those symptoms today.[43]

<u>**Valdez's Termination of Employment**</u>

21.     Because of the severity of his many debilitating health conditions, Valdez was never released to return to work after he was placed on STD leave in July 2012, and he did not report to a Tyco worksite again.[44]

22.     Valdez's STD leave benefit expired January 22, 2013, at which point Tyco approved an additional, unpaid personal leave of absence until April 14, 2013, with a prospective return to work date of April 15, 2013.[45]  He did not return to work at that time, however.[46]

23.     Valdez also failed to request an extension of his personal leave of absence from Sedgwick CMS ("Sedgwick"), who administers Tyco's leave benefits. On April 17, 2013, Tyco alerted Valdez that his employment would be terminated if he did not provide Sedgwick with the necessary documentation to support a leave extension. As of April 22, 2013, and despite multiple requests, Valdez still had not applied for a leave extension. Accordingly, Tyco notified Valdez that he was being terminated for job abandonment.[47]

24.     Giddings is not aware of any employee who failed to follow Tyco's procedures for obtaining an extension of a medical leave and who failed to show up for work on three consecutive days and who was not terminated.[48]

25.     At the time Tyco terminated Valdez's employment, his health conditions had not improved and he had not been medically cleared to return to work. At Valdez's depositions, he

---

[43] Depo. I 61:1-8; 62:16-63:2; Depo. II 29:8-23.

[44] Depo. I 56:7-15; Docket no. 28, ¶ 11 & Exs. 8-11.

[45] Depo. I 71:22-72:21; Docket no. 28-12.

[46] Depo. I 71:19-72:21; 75:19-76:1; Docket no. 28, Exs. 13 & 14.

[47] Depo. I 71:22-72:21; 75:9-23; Docket no. 28, Exs. 13 & 14.

[48] Docket no. 28, ¶ 16.

testified that he had not been able to safely perform the physical duties of an Installer at any time since his employment at Tyco ended.[49] Valdez has not held any job since his employment at Tyco ended, and he still has not been released to work in any capacity by his doctors. Instead, Valdez pursued disability insurance benefits from the Social Security Administration ("SSA"), which made a partial award of benefits in the approximate amount of $1,600 per month as of January 29, 2016.[50] To obtain those benefits, Valdez represented to the SSA that he was "unable to work" because of severe physical and mental limitations.[51] In his deposition, Valdez confirmed that he has been unable to work in any capacity since the termination of his employment at Tyco in April 2013.[52]

### Agency Proceedings

26.     On August 12, 2013, Valdez filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Utah Antidiscrimination and Labor Division ("UALD"). Valdez checked the boxes for national origin, retaliation, and disability on the EEOC form; he did not indicate he had been discriminated against on the basis of race, color, or age. Valdez also did not allege that Tyco failed to accommodate him by offering him a job transfer or attribute his termination to any protected characteristic other than disability.[53]

27.     The UALD closed its investigation on September 26, 2014, finding no reasonable cause to support Valdez's Charge.[54] Valdez appealed that determination and requested an

---

[49] Depo. I 26:21-27:1; 65:11-14. In direct contravention to his testimony, Valdez's declaration submitted in opposition to Tyco's motion for summary judgment states he was capable of returning to work with "some restrictions and under the supervision of other installers that could verify [his] work." Docket no. 30-1, ¶ 75. Again, Valdez fails to offer any competent explanation for these inconsistencies and the statements are therefore stricken.

[50] Depo. I 75:24-76:1; 140:3-9; Depo. II 11:12-15; 12:9-25; 28:6-25.

[51] Depo. II 29:8-23.

[52] Depo. II 30:8-24.

[53] Docket no. 27-2.

[54] Docket no. 27-3.

evidentiary hearing before the agency's Adjudication Division.[55]  After limited discovery, Tyco filed a motion for summary adjudication; Valdez responded by withdrawing his appeal.[56]  The EEOC issued a right to sue notice on October 14, 2015.[57]

28.      On January 6, 2016, Valdez filed his Complaint in this Court, alleging violations of Title VII, 42 U.S.C. § 1981, and the Age Discrimination and Employment Act.[58]  The Complaint alleged race, color, and age discrimination and harassment under federal law only.[59]  Valdez abandoned any disability-related claims under the Americans with Disabilities Act or analogous state law.[60]

### SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment when there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law.[61]  The party moving for summary judgment has the initial burden of showing that there is an absence of evidence to support the non-moving party's case. Once that initial burden is satisfied, the burden shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact for trial.[62]

"To defeat a motion for summary judgment, a party cannot merely rest on the allegations contained in the complaint and other filings."[63]  Instead, the nonmoving party must come forward with specific facts, supported by materials that would be admissible at trial, showing the

---

[55] Docket no. 27-4.

[56] Docket no. 27, ¶ 6 & Exs. 5, 6.

[57] Docket no. 27, Ex. 7.

[58] *See* docket no. 2.

[59] *See id.*

[60] *See id.*

[61] *Pumphrey v. Wood*, No. 1:12-CV-115 TS, 2015 WL 1393233, at *4 (D. Utah March 25, 2015).

[62] Fed. R. Civ. P. 56(a).

[63] *Pumphrey*, 2015 WL 1393233, at *4.

existence of a genuine issue for trial.[64]  If the non-moving party fails to meet this burden as to one element of a claim, summary judgment is appropriate.[65]

## DISCUSSION

**A. Valdez Fails to Raise a Triable Issue of Race or Color Discrimination Under Section 1981.**

1. **Valdez Fails to Establish a Prima Facie Case as to Most of the Acts He Contends Are Discriminatory.**

Valdez alleges that, having asserted his race played a role in certain acts taken by his supervisor, "TYCO [] must show that absent Mr. Valdez's race," the alleged discriminatory acts "would not have occurred."[66]  Valdez misunderstands the burdens of proof. It is Valdez, not Tyco, who bears the burden of coming forward with evidence sufficient to establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) similarly situated persons outside his protected class were treated more favorably.[67]  Valdez's claim fails in the first instance because the majority of "discriminatory" acts he alleges are not adverse employment actions.

In the context of a discrimination claim, adverse employment actions are employment actions that "result in an adverse effect on the terms, conditions, or benefits of employment," such as hiring, discharge, and setting compensation.[68]  Actions that cause no more than a "bruised ego" do not suffice.[69]

---

[64] *Id*.

[65] *Id*.

[66] Plaintiff's Opposition to Motion for Summary Judgment at 8, docket no. 30, March 24, 2017.

[67] *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988).

[68] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 60, 62 (2006) (internal punctuation omitted).

[69] *Cf. Ellerth*, 524 U.S. at 761 (describing "tangible employment actions" in the context of harassment liability).

At his deposition, Valdez identified only four Tyco employees whom he believes discriminated against him: his supervisor, Giddings, and three coworkers, Williams, Stokes, and Hill.[70]  Of those four persons, only Giddings was authorized to take material employment action against Valdez.[71]  As a result, it stands to reason that Williams, Stokes, and Hill, Valdez's peers, could not have "discriminated" against him.[72]

With respect to Giddings, Valdez identified the following allegedly discriminatory actions:

- Valdez once walked in on a conversation between Giddings and another employee and believes she was saying (or was about to say) "I hate Mexican music," but all Valdez heard was "I hate Mexican";

- After Valdez left Tyco's employment, Giddings did not allow him on premises to retrieve his tools from his work van; and

- On occasion over the course his seven-year employment, Valdez had difficulty obtaining tools he needed for his job as an installer.[73]

None are materially adverse employment actions. The first, a single off-hand comment (which was not directed at Valdez), did not adversely affect the terms, conditions, or benefits of Valdez's employment. At most, that comment resulted in a "bruised ego," which is not actionable. The second—Giddings' alleged refusal to let Valdez clean out his van—also is not a materially adverse employment action. Critically, Valdez admitted at deposition that that incident occurred *after his termination*.[74]  As such, it could not possibly have affected the terms, conditions, or benefits of Valdez's employment, which had already ended. Though a closer call, Valdez's third alleged adverse action—that he had trouble getting tools issued to him from the

---

[70] Depo. I 89:6-90:6, 95:25-96:6; Docket no. 28, ¶ 15.

[71] *See* Depo. I 95:25-96:6; Docket no. 28, ¶¶ 3, 15.

[72] Tyco is liable for the Williams' and Hill's conduct only if it amounts to actionable *harassment*. *Cf. Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 737 (10th Cir. 2014). As discussed elsewhere, it does not.

[73] Depo. I 98:21-100:22.

[74] Depo. I 114:3-115:2.

tool supply facility[75]—also does not amount to a materially adverse employment action. Valdez admits that Giddings always approved his request for tools, and while it may have taken a follow-up request, he ultimately *received* the tools he needed to perform his job, except for a "couple times."[76]  Not having access to certain tools a "couple times" during a seven-year period does not effect a material change in the terms, conditions, or benefits of employment.

Though not specifically cited by Valdez at deposition, Valdez also believes Tyco's decision to terminate his employment was discriminatory. Tyco concedes that Valdez's termination would qualify as a materially adverse employment action, but argues that Valdez's termination cannot support a discrimination claim because there is no evidence that similarly situated persons outside Valdez's protected class were treated more favorably. Tyco is correct. The only evidence in the record on this point is the declaration of Valdez's supervisor, Giddings, who attests that she is unaware of a single employee who failed to follow Tyco's procedures for obtaining an extension of a medical leave and who was *not* terminated.[77]  Valdez's claim fails on this basis alone.

### 2. Valdez Fails to Raise a Triable Issue of Pretext as to His Termination.

Even if Valdez could establish a material issue of fact as to each element of his *prima facie* case, Tyco is still entitled to summary judgment because he fails to raise a triable issue that his termination was discriminatory. When a plaintiff establishes a *prima facie* case, the defendant may respond with a legitimate, non-discriminatory reason for taking the adverse action.[78]  Once

---

[75] Depo. I 106:10-20.

[76] Depo. I 108:1-20.

[77] Docket no. 28, ¶ 16.

[78] *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

the defendant has done so, the burden shifts back to the employee to demonstrate the existence of a genuine issue of material fact as to whether that reason is pretextual.[79]

Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[80]  As a matter of law, neither bald assertions in the pleadings, nor a declaration that contradicts the plaintiff's prior admissions, establish pretext.[81]

Tyco met its burden of production by offering evidence of a legitimate and non-discriminatory reason for terminating Valdez's employment:  Valdez failed to follow Tyco's procedures for obtaining a further extension of a nine-month medical leave. It is well-established that an employer's requirement that an employee provide a medical certification as a condition of returning to work "does not reflect a discriminatory animus."[82]

Valdez offers no direct or indirect evidence that race or color more likely motivated Tyco's decision. Direct evidence is "'evidence, which if believed, proves [the] existence of [a]

---

[79] *Id.* at 256.

[80] *U.S. Equal Employment Opportunity Comm. v. Wiltel, Inc.*, 81 F.3d at 1513 (10th Cir. 1996); *see also Perry v. Woodward*, 199 F.3d 126, 1134-35 (10th Cir. 1999).

[81] *See Pumphrey*, 2015 WL 1393233, at *4 ("To defeat a motion for summary judgment, a party cannot merely rest on the allegations contained in the complaint and other filings.").

[82] *Manning v. American Republic Ins. Co.*, 630 F. Supp. 2d 1017, 1024 (S.D. Iowa 2009); *see also, e.g.*, Prigge v. Sears Holding Corp., 432 Fed. App'x 170, 172 (3d Cir. 2011) (employer's decision to terminate employee for failing to provide medical certifications to justify absences was legitimate and not pretextual); Ahmed v. Salvation Army, No. CCB 12-707, 2012 WL 6761596, at *11 (D. Md. Dec. 28, 2012) (after numerous attempts to obtain completed medical certification form for requested leave, employer was justified in terminating employee for excessive unauthorized absences); Alcala v. Best Buy Stores, LP, No. 2012 WL 6138332, 2012 WL 6138332, at *6-7 (C.D. Cal. Nov. 7, 2012) (no serious dispute that "failure to produce adequate medical certification for leave of absence is an innocent explanation for termination"); Roundtree v. Securitas Sec. Services, Inc., No. 3:10-cv-778 (JCH), 2012 WL 631848, at *12 (D. Conn. Feb. 27, 2012) (termination of employee for non-compliance with permissible request for additional medical certification was justified and non-pretextual); Harrigan v. Dana Corp., 612 F. Supp. 2d 929, 944 (N.D. Ohio 2009) ("It is clear that Plaintiff did not substantiate his leave with medical certification within seven days of his absence or speak to Defendant's HR Department during this time. As such, Plaintiff cannot establish pretext[.]").

fact in issue *without inference or presumption*."[83]  "In contrast, statements of personal opinion, even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination."[84]  "At most, such statements constitute only indirect or circumstantial evidence of discrimination because the trier of fact would have to infer that the bias reflected in the statements was the reason behind the adverse employment decision."[85]  Stated another way, direct evidence of discrimination, standing alone, explicitly connects the allegedly discriminatory motive to the alleged adverse action.[86]

Valdez points to the fact that he overheard "a couple of statements about [Giddings] not liking Mexican music" as evidence of Tyco's motives.[87]  Those comments are not direct evidence of discrimination. Critically, Valdez does not claim that Giddings told him he was being *fired* because she "hate[s] Mexican[s]." Instead, Valdez asks that discriminatory motives be inferred from a comment about Giddings' dislike of Mexican music that was not related to the decision-making process. It is therefore not direct evidence of discrimination. Indeed, because Giddings had no input into the decision to terminate Valdez,[88] and her single comment regarding Mexican music is wholly-divorced from Valdez's termination, it amounts to a mere "stray

---

[83] *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) (quoting Black's Law Dictionary 460 (6th ed. 1990)) (emphasis added); *see also* WilTel, 81 F.3d at 1514 (noting that evidence which "requires the trier of fact to infer that discrimination was a motivating cause of an employment decision" is at most circumstantial evidence of discrimination, not direct evidence).

[84] *Shorter*, 188 F.3d at 1207.

[85] *Id.*

[86] *See Perry*, 199 F.3d at 1134.

[87] Depo. I 99:8-13.

[88] Supplemental Declaration of Jan Giddings in Support of Defendant's Motion for Summary Judgment ¶ 2, docket no. 33, filed April 7, 2017.

remark" not entitled to any probative weight, even if it could be relied upon as indirect evidence of discriminatory animus.[89]

To survive summary judgment, Valdez must adduce some other evidence that reveals sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Tyco's] proffered legitimate reason[] for its action that a reasonable factfinder could rationally find [] unworthy of credence."[90] A plaintiff typically makes such showing in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[91] Valdez submitted no evidence of any type.

To the contrary, Valdez admits that the basis of Tyco's termination decision was valid. He testified that he had repeatedly failed to follow Tyco's policies in requesting a further extension of medical leave:

> Q.     Now, this letter is sent by Melinda Gallegos, who is an HR coordinator at Tyco. …   And she describes in her letter to you that you have been out of work since July 26, 2012, that your FMLA had expired on October 17, 2012, that your short term disability leave also had expired as of January 22, 2013 … that you were approved for an additional unpaid personal leave of absence until April 14, 2013, with a return to work date of April 15, 2013, and that – second paragraph,

---

[89] *Merritt v. Tellabs Operations, Inc.*, 222 Fed. App'x 679, 683 (10th Cir. 2007) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions[,]" and "stray … comments should typically not be admitted unless the plaintiff can link them to personnel decisions or the individuals making those decisions.").

[90] *Jones v. Eaton Corp.*, 42 F. App'x 201, 208 (10th Cir. 2002); *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009).

[91] *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1009 (10th Cir. 2001).

as of … April 17, 2013 … you had failed to return to work and that you had not provided the documentation needed to extend your leave, that Sedgwick attempted to contact you on April 5th and April 12th regarding your return to work and that you had not responded or requested an extension, and that as a result you were a no call/no show on April 15; that on April 16 you spoke with Jan Giddings, and you indicated you were unable to return, that you had not yet requested an extension with Sedgwick.

Do you disagree with anything that's recounted there factually?

A.    *No, I don't disagree with that.*

….

Q.    The letter of April 22, 2013, Exhibit 15, states that you had not requested an extension of your leave as had been requested of you. That was true, correct?

A.    *True.*

Q.    And you were not medically cleared to come back to work as of April 22, 2013, true?

A.    *True.*[92]

Valdez's own testimony establishes that Tyco's decision to terminate his employment accorded with its policies.

There also is no evidence that Tyco acted contrary to its regular practices. On this issue, Valdez offered the declaration of his union steward, James Muirhead, who attests that he attended two terminations and, in contrast to Valdez's termination (which was effectuated by letter), "both times the employee was present."[93]  However, Muirhead's vague and limited experience is not probative of pretext. His testimony hardly establishes a "regular practice," particularly in light of the fact that Valdez's was not a "regular" termination. It is undisputed that

---

[92] Depo. I 71:19-72:21; 75:19-76:1; docket no. 28, Exs. 13 & 14.

[93] Declaration of James Muirhead in Opposition to Motion for Summary Judgment  ¶ 15, docket no. 30-2, filed March 24, 2017.

at the time of his termination, Valdez had been on leave continuously for nine months, several communications from Tyco and its third-party leave administrator had gone unanswered, and he was not released to return to work at the time he was terminated (or at any subsequent time).[94] Muirhead does not allege that the other terminations he witnessed occurred under similar circumstances or that Valdez's termination deviated from the norm. Without that evidence, his observations are not probative of pretext. An inference of discrimination arises only from disparate treatment of persons who are similarly situated to the plaintiff in "relevant employment circumstances,"[95] and only where there is evidence of a "disturbing procedural irregularity" that is "often exemplified by an employer's 'falsifying or manipulating of relevant criteria.'"[96] Nothing remotely close to this sort of evidence exists in this case. Summary judgment is therefore warranted.

### 3. Valdez's Failure to Accommodate Claim Fails as a Matter of Law.

Valdez's final theory of liability for discrimination is a quasi-disability claim. Having abandoned his disability claim under the ADA, his Complaint attempts to recast a failure-to-accommodate claim as race or color discrimination, asserting that Tyco allegedly "refused to allow Mr. Valdez to be transfer to a position that would accommodate his work related work restrictions," and instead fired him, although "Caucasian[s] were allowed to make similar position transfers."[97] This claim fails for several reasons. First, Valdez concedes he was not capable of returning to work at Tyco at the time he was terminated.[98] Indeed, Valdez has not

---

[94] Depo. I 71:19-72:21; 75:19-76:1; Docket no. 28, Exs. 13 & 14.

[95] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[96] *Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. Appx. 686, 2008 WL 4597226, **10 (10th Cir. Oct. 6, 2008).

[97] Docket no. 2, ¶¶ 56, 61 & Ex. 1.

[98] *See, e.g.*, Depo. I 65:10-14 ("Q. … Do you believe that you had improved enough as of April 23, 2013, to return to work at Tyco? A. No.").

been released to return to work *in any capacity* since he began his leave of absence from Tyco.[99] To the contrary, his doctors have continued to express their belief that he is *not* capable of working.[100]

Second, Valdez never requested a transfer, which request would have been necessary to support his claim under the rubric of race or color discrimination. To establish the *prima facie* case of failure to hire or promote under Section 1981, Valdez must have shown, *inter alia*, that he applied for—or at least sought—a position.[101] Valdez's own testimony makes clear that that did not happen here.[102] He testified as follows:

> Q.    Did you ever request an accommodation for a medical or mental health condition while employed at Tyco?
>
> Do you know what I mean by that? Did you ever request –
>
> A.    **No. I hadn't gone back to work yet.**
>
> Q.    Okay.
>
> A.    **I didn't know about any requests being made.**
>
>              ….
>
> Q.    [] But since you hadn't been back to work, just so I'm clear, you hadn't requested an accommodation for any disability or medical or mental health condition from Tyco, correct?

---

[99] Depo. I 26:21-27:4, 41:9-23; Depo. II 12:9-25, 30:8-24.

[100] Depo. I 42:24-43:25, 44:10-15, 61:1-8; 63:3-10, 63:16-22.

[101] *Stewart v. Bd. of Comm'rs for Shawnee Cty.*, 216 F. Supp. 2d 1265, 1281 (D. Kan. 2002) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1228 (10th Cir. 2001) (quoting Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251-52 (10th Cir. 1992)) ("[T]he law does require 'that the employer be on specific notice that the plaintiff seeks employment.'"); *accord* Fischer v. Forestwood Co., 525 F.3d 972, 985 (10th Cir. 2008) (Title VII).

[102] *See also* docket no. 28, ¶ 19.

A.    *I didn't know any requests could be made. … I don't believe I asked for any.*[103]

Having not asked for any accommodation in the form of a job transfer (which Valdez was not capable of performing anyway), he cannot now assert that it was discriminatory for Tyco not to transfer him. Tyco is therefore entitled to judgment as a matter of law.

**B.  Valdez Does Not Establish a Claim for Hostile Work Environment Under Section 1981.**

In his Sixth Claim for Relief, Valdez alleges that Tyco created a hostile work environment in the workplace that "encouraged racial disparity, racial denigration, and racial hostility between [Valdez] and his Caucasian counterparts."[104]  In his deposition, Valdez testified that four Tyco employees, (Giddings, Hill, Stokes, and Williams), made remarks that he found harassing or discriminatory based on his race, color, or perceived national origin.[105]  Only one of those individuals (Giddings) was Valdez's manager; the others were his coworkers. None of the conduct he described,[106] either in isolation or collectively, qualifies as a hostile work environment as a matter of law:

**Giddings**. Valdez testified that he never heard Giddings say anything negative to him about Mexicans or Hispanics, but that once, as described above, at an unspecified time, he walked in on a conversation between Giddings and another employee and believes she said (or was about to say) "I hate Mexican music."[107]  Valdez also speculated that Giddings might have harbored a discriminatory animus towards him because, although she always approved his

---

[103] Depo. I 78:1-25.

[104] Docket no. 2, ¶ 10.

[105] Depo. II 40:14-18.

[106] To the extent Valdez attempts to bolster his claim by alleging additional allegations of harassment in his declaration, those allegations are stricken for the reasons discussed in Tyco's Evidentiary Objections, docket no. 31-1.

[107] Depo. I 99:8-100:6; Depo. II 59:15-61:1.

request for tools, he had trouble getting the tools issued to him from the tool supply facility.[108] Valdez admits, however, that he ultimately received the tools he needed, except a "couple times."[109]

**Hill**. Hill was an installer like Valdez.[110] Valdez testified that he believed Hill "hated" him because Hill was "a redneck from El Paso," made general negative comments about Mexicans, and would not work with him on certain jobs.[111] Valdez also suspects that, once, in November 2011, Hill "got [him] in trouble" with Giddings by reporting that he (Valdez) had left material unsecured at a worksite, resulting in an unwarranted discipline.[112] Valdez admits he did not like Hill either and refused to work with him.[113] As a result of this mutual dislike, Valdez testified that he worked with Hill "about three times in [his] whole career" and would only see him in passing when jobs were assigned.[114] Although Valdez occasionally overheard Hill make remarks in the parking lot about throwing rocks at Mexicans coming over the border and taking "Mexican showers,"[115] Hill never directed negative comments to Valdez, because "[h]e wouldn't dare."[116]

---

[108] Depo. I 106:10-20 ("Q. When you say you couldn't get [tools] issued, you would go to Jan [Giddings], request them, and Jan would say no? A. No. She'd say yes. … Q. So why do you think that you were unable to get [tools] because of Jan Giddings' harboring harassing or discriminatory animus against you? A. Because I didn't get them and they were in there.").

[109] Depo. I 108:1-9.

[110] Depo. I 96:2-7.

[111] Depo. I 95:8-96:1.

[112] Depo. II 55:20-56:23.

[113] Depo. I 96:8-12 ("When they sent him out on my jobs, he would take leave, and I would do the same on him, too, because I didn't like him, and he didn't like me.").

[114] Depo. II 53:25-54:12.

[115] According to Valdez, a "Mexican shower" is "where you don't wash, you just use deodorant." Depo. II 41:11-14.

[116] Depo. I 97:5-23.

**Stokes**. Stokes was also an installer. Valdez testified that, unlike Hill, Stokes was "a pretty nice guy," but he "was free with his jokes and . . . comments."[117] Valdez worked with Stokes only "about four times" and, on one or more of those few occasions, heard him make "burro jokes," "Juan Valdez coffee" jokes, and "Mexican shower" jokes. Valdez believed Stokes "was probably doing it in all fun and joking and everything," but it "got old."[118]

**Williams**. Williams was a lead installer.[119] In contrast to Hill and Stokes, Valdez testified that he worked with Williams regularly.[120] According to Valdez, Williams would ask him to help on a lot of his jobs, because Valdez "was a worker and [he] hustled."[121] Valdez does not think Williams was a bad person, but he would "speak[] his mind," "and it was always the Mexican jokes."[122]

Valdez explained that Williams would not make Mexican jokes every time they worked together, but, in the break room, where "Dennis had a crowd for everybody to laugh and 'whooo,' and all this stuff," then Valdez would hear Williams make Mexican jokes.[123] In his deposition, Valdez gave four specific examples: (1) He recalled that, in reference to Valdez, Williams would joke "Watch out for him because he'll steal your stuff," which Valdez interpreted as a comment on Mexicans or Hispanics.[124] (2) In a conversation with Hill, Valdez overheard Williams refer to Mexicans crossing the border as "wetbacks."[125] (3) Williams made

---

[117] Depo. II 40:19-41:6.

[118] Depo. II 41:7-19.

[119] [Docket no. 28](#), ¶ 15.

[120] Depo. I 92:1-8.

[121] Depo. I 92:1-8; *see also* Depo. II 49:12-17 ("He would tell me what to do, and he would leave, and I'd get it done[.]").

[122] Depo. I 92:1-8 ("I'm not saying he's a bad guy. I'm just saying Dennis speaks his mind.").

[123] Depo. II 49:18-50:3.

[124] Depo. II 43:13-44:2.

[125] Depo. II 51:9-25.

"burrito jokes" when everybody was eating burritos.[126]  (4) Williams would say "here comes Juan Valdez and his burro" every time Valdez had his cart, which Valdez admitted he thought was funny too, at least at first.[127]  Valdez could think of no other remarks he found discriminatory or harassing.[128]  And he testified that he did not think Williams told these jokes to make Valdez feel bad:  "I think he said them to be funny."[129]  Other than the jokes, the only other specific conduct Valdez found objectionable was one instance, in 2011, when Williams had Valdez "dig a trench to bury a pipe," which Valdez felt was discriminatory, because he had not seen anyone else do that before.[130]

Accepting these allegations as true, they do not give rise to employer liability under Section 1981 for three independent reasons: (1) most, if not all, of the alleged conduct occurred outside the statute of limitations; (2) even if the alleged conduct could be considered in totality, it was not sufficiently pervasive or severe to give rise to actionable claim; and (3) Tyco has a valid *Ellerth/Faragher* defense to liability, because Valdez admits he never complained of conduct he perceived as harassing or discriminatory, despite his knowledge of robust reporting procedures available to him.

---

[126] Depo. II 44:11-14.

[127] Depo. II 52:1-8 ("And it's funny and it's – you know, but after a while, I started to think that it's affecting my position there.").

[128] Depo. II 53:7-13.

[129] Depo. II 50:17-19.

[130] Depo. I 93:17-24.

## 1. A Four-Year Statute of Limitations Bars Consideration of Conduct About Which Valdez Complains.

The statute of limitations for bringing a claim under Section 1981 is four years.[131] Based on Valdez's filing date of January 6, 2016,[132] Valdez must assert facts showing that his hostile work environment claim arose on or after January 6, 2012.[133] Under the "continuing violation" doctrine, acts that occurred prior to January 6, 2012, can be considered only if at least one act contributing to the "same hostile work environment" takes place within the statutory time period.[134] To determine whether acts are part of the same hostile work environment, a court looks at "the type of these acts, the frequency of the acts, and the perpetrator of the acts."[135]

Valdez reported to work at Tyco only through July 2012, meaning that, at most, a brief window of seven months of his employment falls within the limitations period. By this time, Valdez admitted that one of the four alleged harassers, Stokes, was long gone, having left the company at least two years earlier.[136] Similarly, one of the few instances of harassing conduct Valdez attributes to Hill—falsely reporting him to Giddings for failing to secure material at a worksite—occurred no later than November 2011.[137]

---

[131] *Jackson v. RGIS Inventory Serv.*, No. 2:15-CV-9 TS, 2015 WL 5244333, at **6-7 (D. Utah Sept. 8, 2015) (citing 28 U.S.C. § 1658).

[132] *See* docket no. 2.

[133] *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008) (quoting Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002)). Valdez's filing of agency charges with the EEOC and UALD did not toll the statute of limitations on his Section 1981 claims. *See Johnson v. Rlwy. Express Agency*, 421 U.S. 454, 465-66 (1975).

[134] The continuing violation doctrine applies to hostile work environment claims under either Title VII or Section 1981. *Fullwiley v. Union Pac. Corp.*, 273 Fed. App'x 710, 713-14 (10th Cir. 2008).

[135] *Smout v. Cutrubus Motors*, No. 1:15-CV-1, 2016 WL 3461210, at *3 (D. Utah Jun. 21, 2016) (quoting Duncan v. Manager, Dep't of Safety, Cty. & Cnty. of Denver, 397 F.3d 1300, 1308 (10th Cir. 2005)).

[136] Depo. II 41:3-6 ("He left, I believe, in '09 . . . Or '10.").

[137] Depo. II 55:20-56:23.

As for Giddings and Williams, Valdez does not remember whether they said anything he found offensive in 2012 that could give rise to a timely claim.[138]  By contrast, Valdez recalled that Williams had him dig a trench "right after [his] accident," which would have been early 2011.[139]  Valdez also presents no evidence that Giddings, Williams, Hill, and/or Stokes acted in concert, or even had knowledge of one another's alleged conduct, such that their acts could be considered part of the same hostile work environment.[140]  In short, Valdez's vague allegations do not establish a timely claim.[141]

## 2. Valdez Fails to Allege Conduct Sufficiently Pervasive or Severe.

Even all the conduct Valdez attributes to Giddings, Hill, Stokes, and Williams is considered, that conduct was not sufficiently pervasive or severe to give rise to an actionable claim. To survive summary judgment, Valdez "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the victim "was targeted for harassment because of [his] . . . race[] or national origin."[142]  To meet this burden, Valdez must do more than demonstrate "a few isolated incidents of racial enmity" or "sporadic racial slurs."[143]  Nor can he prevail on a claim

---

[138] Depo. II 60:12-14; 67:1-9-14 ("Q. Mr. Valdez, can you think of a specific remark by Dennis Williams that you felt was discriminatory or harassing on the basis of race, color, or national origin that you know for a fact was in 2012 as opposed to another time?  A. No.").

[139] Depo. I 33:1-6; 92:14-24.

[140] Depo. II 67:20-24 ("Q. Do you know for a fact whether Janice Giddings ever overheard a statement by Dennis Williams that you felt was discriminatory or harassing on the basis of race, color, or national origin?  A. I wouldn't know.").

[141] *See Fullwiley*, 273 Fed. App'x at 713 ("Mr. Fullwiley is unable to provide even an approximate date for a few of the alleged incidents of harassment. As a result, we do not consider these allegations either."); Smout, 2016 WL 3461210 at *3 (finding hostile work environment claim untimely where plaintiff was unsure when incidents took place, and acts "did not involve same employment actions, did not occur within any known frequency, and were perpetrated by [more than one employee].").

[142] *Sandoval v. Boulder Regional Comms.*, 388 F.3d 1312, 1327 (2004).

[143] *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quotations omitted).

"merely by establishing a pattern of 'general harassment.'"[144] Instead, "there must be a steady barrage of opprobrious racial comments."[145]

To discern the difference between actionable harassment and "run-of-the mill boorish, juvenile, or annoying behavior," courts look to such things as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[146] Instances of coworker incivility, rudeness, and offensive statements have often been found to be insufficiently severe, as federal law does not create a "general civility code for the American workplace."[147] And, as noted above, the acts constituting the alleged hostile work environment must be sufficiently related, *i.e.*, they must involve the same type of employment actions, occur relatively frequently, and be perpetrated by the same employees.[148]

Valdez's deposition testimony shows that he cannot meet these standards: He admitted that Giddings (the only manager) said nothing more offensive than "I hate Mexican music" to another employee.[149] Valdez admitted working with Hill and Stokes very infrequently (three and four times, respectively) and the jokes or comments he alleges they made (none of which, at least in Hill's case, were directed at him), are precisely the kind of "isolated incidents of racial enmity" and "sporadic racial slurs" that are not actionable.[150] Lastly, Williams engaged in more

---

[144] *Brown v. Lowe's HIW, Inc.*, No. 2:13CV72 DAK, 2014 WL 4922614, at *6 (D. Utah Sept. 30, 2014).

[145] *Id.*; *see also* Schofield v. Maverick Country Store, 26 F. Supp. 3d 1147, 1160 (D. Utah 2014) (noting that offensive utterances, jokes, or boorish behavior do not constitute actionable adverse employment actions unless so severe and pervasive that workplace is "permeated with discriminatory intimidation, ridicule, and insult").

[146] *Gaff v. St. Mary's Regional Med. Ctr.*, 506 Fed. App'x 726, 728 (10th Cir. 2012) (quotations, citations omitted).

[147] *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir. 2008).

[148] *See Duncan*, 397 F.3d at 1309 (distinguishing between instances of threatening physical and psychological harassment and off-color comments and rumor-spreading perpetrated by a completely different set of actors).

[149] Depo. I 99:8-100:6.

[150] *See Chavez*, 397 F.3d at 832.

frequent joking, but Valdez admits knew Williams "said [the jokes] to be funny."[151]  "Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having 'alter[ed] the conditions of the victim's employment and create[d] an abusive working environment."[152]  Valdez's hostile work environment claim fails as a matter of law.

### 3. Valdez's Failure to Complain Entitles Tyco to a *Faragher/Ellerth* Defense.

Even if Valdez could sustain a claim for hostile work environment, Tyco would still be entitled to summary judgment based on the *Faragher/Ellerth* defense. That defense applies where (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (b) the plaintiff employee unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer or to avoid harm otherwise.[153] The purpose of the *Faragher/Ellerth* defense is to "recognize the employer's affirmative obligation to prevent violations and give credit . . . to employers who make reasonable efforts to discharge their duty."[154]

Here, Valdez received an ADT Team Member Handbook ("Handbook") that set out the Company's anti-discrimination, anti-harassment, and anti-retaliation policies.[155]  If Valdez felt that he had been subjected to any kind of discrimination, harassment, or retaliation, he was required to report the conduct immediately using any of nine approved reporting channels:

---

[151] Depo. II 50:17-19.

[152] *Nettle v. Central Okla. American Indian Health Counsel, Inc.*, 334 Fed. App'x 914, 924 (2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

[153] *Ellerth*, 524 U.S. at 764.

[154] *Faragher*, 524 U.S. at 806.

[155] Depo. I 85:15-19.

- A supervisor or any other member of management;
- A department/operations manager;
- The location's Human Resources representative;
- The Corporate Human Resources Team;
- The Vice President of Human Resources;
- An email Hotline ("Hotline@ADT.com");
- A worldwide 24-hour ConcernLINE (1-800-714-1994);
- The Office of the Ombudsman at 877-232-4121; or
- Tyco's Law Department.[156]

Valdez admits that he was aware of, but failed to utilize, any of these reporting channels to place Tyco on notice of unlawful conduct.[157] As a result, to avoid summary judgment, Valdez must come forward with some admissible evidence that Tyco would not have responded to his complaints or that he would have suffered retaliation. Specifically, "[e]vidence must be produced to the effect that [Tyco] has ignored or resisted similar complaints or has taken adverse actions."[158]

Valdez produced no such evidence. To the contrary, in his depositions, he explained that he failed to complain because he thought he could "hold [his] own and be able to stomp [the harassment] out himself," because he did not "trust authority," because "[y]ou can't complain every time someone says something," and because he "would have been inundated with more paper."[159] Accordingly, Valdez testified that he decided to confine his complaints to his Union

---

[156] [Docket no. 28-1, at 12](#), 20.

[157] Depo. I 83:11-84:2; 84:8-87:1; 87:25-88:17 ("Q. And based on your testimony, you did not use any of these reporting channels available to you when you felt that you had been harassed or retaliated [against] at Tyco, correct? A. Correct.").

[158] *See Calloway v. Aerojet General Corp.*, 2010 WL 2430242, *3 (D. Utah Jun. 14, 2010) (citing *Leopold v. Bacarrat, Inc.*, 239 F.3d 243, 246 (2nd Cir. 2001); *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158 (9th Cir. 2003)).

[159] Depo. I 83:11-84:2; 84:8-87:1; 87:25-88:17; Depo. II 42:8-17.

Steward, which he believed would be "more effective."[160] Those are not valid excuses. Valdez's

decision to ignore all nine of Tyco's reporting channels was unreasonable, and the fact that he

complained to his Union Steward (who Tyco did not empower to handle complaints of

harassment) is irrelevant.[161]

Valdez does not argue that his failure to complain is excusable, but rather attempts to

circumvent this defense altogether by arguing that his termination is a "tangible employment

action" and that, as a result, Tyco "does not have recourse to the *Ellerth/Faragher* affirmative

defense" under *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).[162] Valdez has

confused his claims of discrimination and harassment. The administrative termination of Valdez

for failing to follow absence policies was a discrete act occurring nine months into a medical

leave. It constituted actionable discrimination if Valdez had evidence that Tyco's reason for

terminating him was unlawful pretext. As explained elsewhere, he lacks that evidence.

By contrast, Valdez's claim that he was subjected to an actionable hostile work

environment requires different evidence. He must show that, in the months before he was placed

on medical leave, (and within the statute of limitations—*i.e.*, from January to July 2012), he was

"targeted" for harassment because of his race or national origin and that the workplace at Tyco

was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently

severe or pervasive to alter the conditions of his employment and create an abusive working

---

[160] Depo. I 88:12-17.

[161] *See*, *e.g.*, Maddin v. GTE of Florida, 33 F. Supp. 2d 1027, 1032-33 (M.D. Fla. 1999) (employee acted unreasonably in making harassment complaint to Union Steward who was not identified as authorized recipient of complaints pursuant to company policy).

[162] Docket no. 30 at 13.

environment."[163]  Tyco is liable for a hostile work environment, if at all, on a negligence theory, which means Valdez must also show that Tyco "fail[ed] to take adequate remedial and preventative responses to any actually or constructively known harassment."[164]  Valdez did not come forward with evidence of actionable harassment during the relevant time period, and, even if he had, Tyco validly invokes the *Faragher/Ellerth* defense, because, as detailed above, Valdez repeatedly admitted that he failed to use any of the reporting channels available to him.[165]

Moreover, Valdez misreads *Suders* and other relevant case law regarding the circumstances in which the employer may invoke the *Faragher/Ellerth* defense. The U.S. Supreme Court has held that an employer cannot invoke *Faragher/Ellerth* where the employee has suffered supervisor harassment that "*culminates in* a tangible employment action, such as discharge, demotion, or undesirable reassignment."[166]  The tangible employment action in *Suders*, for instance, was a "constructive discharge"—in other words, the plaintiff decided to resign in the face of an "abusive working environment" that was the product of supervisor harassment.[167]

Here, Valdez was not constructively discharged, and his termination was not the product of supervisor harassment. Indeed, it is undisputed that Giddings, the only supervisor Valdez accuses of harassment, had no input into his termination.[168]  Instead, Valdez was

---

[163] *Herrera v. Lufkin Industries, Inc*., 474 F.3d 675, 680 (10th Cir. 2007).

[164] *Holmes v. Utah, Dep't of Workforce Servs*., 483 F.3d 1057, 1069 (10th Cir. 2007).

[165] *Ellerth*, 524 U.S. at 765; Faragher, 524 U.S. at 807.

[166] *Id.* at 765 (emphasis added).

[167] *Id.* at 134.

[168] Docket no. 31-1, ¶ 2 ("I had no input into the decision to terminate").

administratively terminated after a nine-month medical leave from which he admits he was unable to return. Unlike the plaintiff in *Suders*, Valdez does not claim that he suffered any workplace harassment by anyone during the nine months culminating in his termination; he was not in the workplace. When Valdez *was* in the workplace, he concededly did not complain. His attempt to defeat Tyco's *Faragher/Ellerth* defense fails.

### C. Valdez's Title VII Claims Fails for All the Same Reasons His Section 1981 Claims Fail, and for Additional Independent Grounds.

The parties' respective burdens are the same under both Title VII and Section 1981.[169] Accordingly, Valdez's Title VII discrimination and harassment claims fail for all the same reasons his Section 1981 claims do. Valdez's Title VII claims also fail for two independent reasons: (1) the vast majority of actions he relies on in support of those claims are time-barred under Title VII's more restrictive statute of limitations, and (2) Valdez failed to administratively exhaust his only timely claims.

### 1. The Vast Majority of Conduct About Which Valdez Complains Is Time-Barred Under Title VII.

Claims arising under Title VII must be filed with the EEOC within 180 days, or with the UALD within 300 days, of the alleged unlawful employment practice.[170] Valdez filed his Charge with the UALD on August 12, 2013.[171] Accordingly, any allegedly harassing or discriminatory conduct that occurred prior to October 16, 2012, is time-barred.

Here, although Valdez's employment at Tyco did not officially terminate until April 2013, the last day he reported to work was July 26, 2012, after which he was placed on an STD

---

[169] *See Perry*, 199 F.3d at 1134-35; *Fullwiley*, 273 F. App'x at 717-18.

[170] 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.13.

[171] *See* Docket no. 2.

leave from which he never returned. Valdez admits that, once he was no longer in the workplace, he did not communicate with alleged harassers, much less experience harassment.[172] Accordingly, the potentially harassing conduct about which he complains would have had to occur on or before July 26, 2012, nearly three months before the statutory cut-off date.

Valdez also cannot save these claims through an invocation of the "continuing violation" doctrine. Untimely acts can be considered only if at least one act contributing to the "same hostile work environment" takes place within the statutory time period.[173]  Only one allegedly unlawful employment practice occurred during the limitations period:  Valdez's termination, which occurred in April 2013. The U.S. Supreme Court has held unequivocally that the continuing violation doctrine does not apply to discrete discriminatory acts, like Valdez's termination, which "occur," for purposes of 42 U.S.C. § 2000e-5(e)(1), on the day they "happen."[174]  In any case, the alleged harassment is too distinct from the termination decision to be considered part and parcel of the "same hostile work environment."  Valdez adduces no evidence to connect his termination to other complained-of events and no evidence that any of the perpetrators of the other allegedly harassing acts had any input with regard to his termination.

To the contrary, Tyco has adduced evidence that none of the alleged harassers (including Valdez's supervisor, Giddings) had any such input.[175]  Valdez's termination, separated from the other alleged acts of harassment by at least nine months, is also too remote in time and too distinct in nature to be part of "continuing" harassment.

---

[172] Depo. I 95:4-7; 98:16-18; 98:21-100:18.

[173] *Tademy*, 614 F.3d at 1139; Morgan, 536 U.S. at 110.

[174] *Morgan*, 536 U.S. at 110-13, 117.

[175] *See* Docket no. 33, ¶ 2; Docket no. 28, ¶ 15; Depo. I 95:25-96:6.

### 2. Valdez Failed to Administratively Exhaust His Only Timely Claims Under Title VII.

Valdez's discrimination also cannot survive summary judgment because Valdez failed to timely exhaust them. Before bringing a civil action under Title VII, a plaintiff must file a timely administrative charge.[176] An unexhausted claim is subject to dismissal with prejudice, unless there is time left in the limitations period for the plaintiff to file a timely EEOC charge.[177]

In his Complaint, Valdez alleges that Tyco failed to accommodate him by transferring him to a new position and instead terminating him in April 2013 because of his race and color.[178] Those claims do not appear anywhere in Valdez's EEOC Charge.[179] Rather, during the agency proceedings, Valdez contended that his termination was due to *disability* discrimination only.[180] Additionally, more than 300 days have now elapsed since Valdez's termination in April 2013, so he could not now exhaust his new theories of relief. Tyco is therefore entitled to dismissal of Valdez's Title VII claims with prejudice.

### D. Tyco Is Entitled to Summary Judgment on Grounds that Valdez Cannot Recover Damages.

As a final matter, Valdez's claims fail because he cannot show that he suffered any damages as a result. This is true for two reasons: (1) since his separation from Tyco, Valdez has never been "ready, willing and able" to work; and (2) he has already obtained a complete and/or exclusive remedy for any alleged harm.

---

[176] *See Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996).

[177] *See Douglas v. Norton*, 167 F. App'x 698, 711 (10th Cir. 2006); *Lebron-Rios v. U.S. Marshal Servs.*, 341 F.3d 7, 12 (1st Cir. 2003).

[178] Docket no. 2, ¶¶ 56, 61.

[179] *See* Docket no. 27-2.

[180] *Id.*

**1. Valdez's Inability to Work Forecloses a Claim for Economic Damages.**

Where an employee is not "ready, willing and able" to return to work, lost wages and benefits are not available as a matter of law.[181]  In *Jackson*, for example, the plaintiff "unequivocally testified she had been medically unable to work at any job, even one involving only light duties, since November 15, 1998, and had completely withdrawn from the job market."[182]  As a result, the court held that her claim for lost wages and benefits under Title VII failed "for lack of remedy."[183]

Valdez provided similar unequivocal testimony that he was unable to work "in any capacity," and attributed that solely to his workplace injury:

Q. Do you agree that you have been disabled and unable to work in any capacity since your separation from Tyco in April 2013?

*A.* *Yes.*

….

Q. Do you agree that the reason you have been unable to work in any capacity since your separation from Tyco in April 2013 or returned to work as an installer is the result of the electrical shock injury you suffered in March 2011 and the resulting effects that had on you?

*A.* *Yes.*[184]

Valdez made similar representations to the SSA in support of his application for disability benefits:

Q. Okay. Directing your attention to the second paragraph from the top. There's the statement: "The claimant reports he is unable to work due to severe symptoms and limitations caused by chronic migraines, bulging discs in his neck,

---

[181] *Jackson*, 92 Fed. App'x at 587-88 & n.3.

[182] *Id*. at 586.

[183] *Id*. at 588.

[184] Depo. II 30:8-24.

vertigo, dizziness and balance problems, concentration and memory problems."
Is it true you made that report to the Social -- Social Security Administration?

*A.*     *Yes.*

Q.     And is -- are you suffering from all of those symptoms today?

*A.*     *Yes.*

Q.     And is it true that you are currently unable to work today because of those severe symptoms and limitations described here?

*A.*     *Yes.*

Q.     And you attribute all of those symptoms to your having been electrocuted in May -- in -- sorry, in March of 2011, correct?

*A.*     *Correct.*[185]

Valdez does not attribute his inability to work to any conduct giving rise to his discrimination or hostile work environment claims under Title VII or Section 1981, and the result is the same as in *Jackson*: Valdez's claim for lost wages and benefits fails for lack of remedy.

### 2. The WCA and a Separate Civil Lawsuit Foreclose Valdez's Claims for Both Economic and Non-Economic Damages.

The Workers' Compensation Act of Utah ("WCA") is "the exclusive remedy against an employer" for injuries sustained by an employee "in the course of or because of or arising out of the employee's employment."[186] In his deposition, Valdez attributed all physical or mental impairments to his workplace shock injury. For example:

---

[185] Depo. II 29:8-23.

[186] UCA 34A-2-105(1).

Q.      And do you think that all the physical and mental symptoms that you reported to Dr. Hoffman in August 2012 were triggered by the electrical shock on March 19, 2011?

*A.      Well, I didn't tell her that. I told her all the circumstances, and she told me that.*

Q.      And do you personally believe that all the physical and mental symptoms you reported to Dr. Hoffman were triggered by the electrical shock on March 19, 2011?

*A.      Yes.*[187]

Valdez received workers' compensation benefits as a result of the injury he sustained at the slaughterhouse in March 2011.[188]  While on medical leave, he received wage replacement benefits for lost time. He also received a workers' compensation settlement.[189]

Additionally, Valdez subsequently pursued a civil lawsuit against the slaughterhouse, alleging that the slaughterhouse was responsible for his continuing health and mental impairments, including daily headaches, dizziness, memory problems, PTSD, panic attacks, a detached retina, psychological and cognitive difficulties, inability to maintain a checkbook, difficulty focusing on even the simplest of household chores, the need for medications, a fear of heights, and other phobias.[190]

In the lawsuit, Valdez sought one million dollars as compensation for these problems, as well as his medical expenses, and as compensation for his "great physical and mental pain and anguish" that he predicted would continue "long into the future, if not for the balance of his

[187] Depo. I 57:14-59:3.

[188] Depo. I 31:18-23, 32:8-33:10.

[189] Depo. I 31:18-23, 32:8-33:10.

[190] Docket no. 27, Exs. 8 & 9.

natural life."[191]  In January 2016, Valdez settled the lawsuit and received $290,000 to compensate him for these claimed injuries.[192]

As a result of the WCA's exclusive remedy provision and Valdez's settlement with the slaughterhouse, he cannot recover additional amounts from Tyco for the same injuries. The law does not permit "double recovery."[193]  Valdez's claims must be dismissed for this additional reason.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that Tyco's Motion[194] is GRANTED and all claims against Tyco are dismissed with prejudice.

The Clerk is directed to close the case

Signed January 18, 2019

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[191] Docket no. 27-9, at 6, 7; Depo. II 21:9-25:4.

[192] Depo. II 25:5-26:9, 30:3-7.

[193] See *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual"); Burlington Northern and Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1030 (10th Cir. 2007) (plaintiff is "not entitled to a double recovery for the same injuries"); Elson v. Colo. Mental Health Inst. at Pueblo, No. 09-cv-01375-MSK-CBS, 2011 WL 1103169, at *4 (D. Colo. Mar. 24, 2011) ("Worker's Compensation exclusivity prevents the Plaintiffs from recovering damages under Title VII for the physical injuries they sustained, as well as any emotional distress or other non-economic damages they suffered as a result of being physically injured; indeed, they have already been fully compensated for their physical injuries as a result of their Worker's Compensation claims.").

[194] Defendant Tyco Integrated Security LLC's Motion for Summary Judgment, docket no. 26, filed February 24, 2017.